IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KATHY D. GOWER, individually and
as Administratrix of the Estate of
JOHN RANDALL GOWER, deceased,

                Plaintiff,

v.                                    // CIVIL ACTION NO. 1:06CV154
                                      (Judge Keeley)

AIG CLAIM SERVICES, INC., and
AIG LIFE INSURANCE COMPANY,

                Defendants.

## MEMORANDUM OPINION AND ORDER

### I. Introduction

This case requires the Court to review a denial of accidental death benefits to the plaintiff under a group accident insurance policy ("Policy") provided by the Defendant AIG Life Insurance Company ("AIG"). (AIG/Gower 363).[1]  To conduct such review, the Court must interpret and apply three separate provisions of the Policy.

Initially, the Court must determine what standard of review applies to AIG's denial of benefits.  Next, the Court must decide whether AIG appropriately denied a claim for accidental death benefits under its Policy.  Finally, the Court must determine whether an "intentionally self-inflicted injury" caused the loss

---

[1] For purposes of short citation, the Court will refer to documents in the administrative record as "AIG/Gower," followed by the document's page number.

because the Policy specifically excludes that type of loss from coverage.

For the reasons discussed below, the Court **GRANTS** the plaintiff's motion for summary judgment and **DENIES** the defendants' motion.

## II. Statement of Facts and Procedural History

AIG provides the Policy at issue in this case to Peabody Holding Company, a business that operates coal mines. The Policy is an employee benefit plan covered by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132 <u>et seq</u>. Pursuant to the Policy, AIG agrees to pay 100% of the amount of the insurance in force if an injury to an insured person results in that person's accidental death. (AIG/Gower 541).

John Randall Gower ("Gower"), who worked as a coal miner for Eastern Associated Coal Corporation, a division of Peabody Holding Company, was insured under the Policy. (AIG/Gower 363). On November 1, 2003, Gower, forty-one, was found deceased in his home. (<u>Id.</u> at 394).

On January 22, 2004, Kathy Gower ("Mrs. Gower"), the decedent's wife, filed a claim with AIG for accidental death benefits under the Policy. AIG Claims Services, Inc. ("AIGCS"), the Policy's third-party administrator, initially investigated Mrs.

Gower's claim for accidental death benefits. (AIG/Gower 123). During its investigation, AIGCS reviewed the following materials: (1) the Marion County Sheriff's Department Death Investigation Report, (2) a certified copy of Gower's Certificate of Death, (3) a toxicology report, (4) the West Virginia Office of the Chief Medical Officer's autopsy report, and (5) a number of medical and pharmaceutical records. (AIG/Gower 87). AIGCS also obtained the report of an independent forensic toxicologist, Michael Slade, Ph.D. ("Dr. Slade"), and a legal opinion from the law firm of Spilman, Thomas & Battle ("Spilman") regarding whether a proposed denial of benefits to Mrs. Gower would be appropriate under the Policy. (AIG/Gower 94, 122).

The Marion County Sheriff's Department reported that Gower died in his bed during the night and that there was no evidence of foul play. (AIG/Gower 363). According to Mrs. Gower, her husband had complained of a headache when she last spoke with him at 11:30 on the evening prior to his death. (Id.). The Sheriff's investigation report states that, at the time of his death, Gower was wearing four Duragesic patches that release the drug fentanyl. (Id.). The report also notes that several bottles of prescription medicine were in the room with Gower. (Id.).

<u>MEMORANDUM OPINION AND ORDER</u>

On November 3, 2003, Dr. Zia Sabet of the West Virginia Office of the Chief Medical Officer performed an autopsy on Gower and opined that the cause of Gower's death was the "result of combined prescribed Fentanyl, Carisoprodol, Olanazapine, and Diazepam." (AIG/Gower 373). Dr. Sabet expressly classified the manner of death as an accident. (<u>Id.</u>). In conjunction with the autopsy report, the West Virginia Office of the Chief Medical Officer also prepared a toxicology report. The toxicology report states that "[t]he narcotic analgesic, fentanyl, was detected in the blood at a high concentration," and concludes that "[r]espiratory and central nervous system depression would be expected and likely to be lethal." (AIG/Gower 374).

In a letter dated January 3, 2005, AIGCS asked Dr. Slade to review the available materials concerning Gower's death (AIG/Gower 122). In his review, Dr. Slade found that, for many years, Gower had continuously taken prescriptions of fentanyl, carisoprodol and valium without any history of abuse. (<u>Id.</u> at 114-15). Dr. Slade also found that Gower's blood contained therapeutic levels of carisoprodol, but toxic and potentially lethal levels of fentanyl. (<u>Id.</u>). He specifically noted:

> The fentanyl that was prescribed to Mr. Gower was contained in patches that are applied singly to the skin. Each patch is used for three days before it is replaced with a new

4

> patch; and that process continually delivers
> fentanyl to the patient for the relief of
> continuous pain at a rate that produces a
> therapeutic blood level. For the blood level
> to be at the toxic level that was present in
> Mr. Gower, then considerably more than the
> fentanyl present in a single patch was used.

(Id.).  Dr. Slade reasoned from this that Gower had deliberately

applied the additional patches, thus exceeding his prescribed

dosage of fentanyl. (Id.).  Further, he determined that Gower's

blood contained a toxic level of olanzapine (Zyprexa), a drug for

which Gower did not have a prescription. (Id.).  Dr. Slade then

opined that the interaction between the toxic levels of fentanyl

and olanzapine had caused Gower's death. (Id.).

After receiving Dr. Slade's report, AIGCS preliminarily

proposed to deny benefits to Mrs. Gower, but before doing so, it

solicited a legal opinion from Spilman on the appropriateness of

its proposed denial of the claim. (AIG/Gower 111).  After receiving

Spilman's evaluation, AIGC formally denied Mrs. Gower's claim for

benefits under the Policy. (AIG/Gower 89).  In its denial letter,

AIGCS relied primarily on Dr. Slade's conclusion that applying a

number of fentanyl patches to the skin is a "deliberate act."

(AIG/Gower 88).  It therefore concluded that Gower's death had not

resulted from bodily injury caused by an accident, and that his

death has been caused "in whole or in part . . . from an

intentionally self-inflicted injury or an attempt at intentionally self-inflicted injury." (AIG/Gower 89).

After being denied benefits, Mrs. Gower retained legal counsel and filed an appeal with the A&H Claims Department (the "Claims Department"). (AIG/Gower 80). To assist in her appeal, she also retained a clinical pharmacist, Rodney G. Richmond ("Richmond"), to determine whether any evidence established that Gower had overused or abused his medication, and, based on that information, whether Gower's death was accidental or intentionally inflicted. (Id. at 42).

Richmond reviewed the toxicology report and analyzed both the clinical use and Gower's own use of each of the medications found in his system. (Id.). With respect to the olanzapine, Richmond concluded that Gower had confused his own medication with his wife's Zyprexa and mistakenly had ingested the wrong drug. (Id. at 44). Richmond based this conclusion on the following facts: Mr. and Mrs. Gowers' medications were commonly stored in the same location; Zyprexa does not provide pain relief; Zyprexa does not have the potential for abuse (e.g. euphoria); Gower's blood did not contain a toxic level of olanzapine; and, because eighty-two of the original ninety pills of Zyprexa remained, Gower could have ingested no more than eight pills. (Id.).

MEMORANDUM OPINION AND ORDER

With respect to the fentanyl, Richmond concluded that Gower "simply forgot to remove the previous dose when he applied the new dose." (AIG/Gower 45). Richmond based this conclusion on the fact that, historically, Gower had always been compliant with his Duragesic prescription and had never demonstrated any tendency to abuse the drug. (Id.). Moreover, Richmond indicated that inadvertent overdoses of the medication dispensed by the Duragesic patch as a result of patient error in self-administration are well-documented in the medical literature. (Id. at 48). Richmond also noted that, although the level of fentanyl in Gower's blood could be classified as toxic/lethal, the results might be inaccurate due to post-mortem testing problems. (Id. at 46).

Mrs. Gower submitted Richmond's report to AIG's Claims Department in support of her appeal. (AIG/Gower 36). In further support, she also submitted an affidavit stating that: (1) she had never known Gower to abuse his medication during their marriage; (2) Gower had never expressed suicidal thoughts or ideation; and (3) she believed that Gower's death was an accident. (Id. at 37). Regarding the reported presence of Zyprexa in her husband's blood, Mrs. Gower stated that, if Zyprexa were present in her husband's system at his time of death, Gower must have mistakenly taken the

wrong bottle from among the cluster of their medicine bottles.
(<u>Id.</u>).

The ERISA Appeals Committee of AIG (the "Committee") sent
Richmond's report to Dr. Slade and asked him to review and respond
to Richmond's opinions. (AIG/Gower 28, 34).  In his follow-up
report, Dr. Slade disagreed with Richmond about the potential for
toxicology inaccuracies, and stated that the blood-testing methods
used in Gower's case ensured accurate results. (<u>Id.</u> at 13).  Dr.
Slade also stated that Richmond "created confusion and came to
erroneous conclusions" by using the terms "toxic" and "lethal"
interchangeably when referring to Gower's olanzapine blood level.
(<u>Id.</u> at 13).  Dr. Slade also disagreed with Richmond's assessment
of Gower's intent; he found that Gower's past compliance with his
prescriptions was no forecast of any confusion by Gower when he
took his wife's medicine. (<u>Id.</u>).

Following its review of the newly-provided information, on
April 28, 2006, the Committee affirmed the denial of Mrs. Gower's
claim. (AIG/Gower 8).  Specifically, the Committee determined that
Gower intentionally applied all four fentanyl patches and took a
large, single dose of his wife's olanzapine. (<u>Id.</u> at 9).  The
Committee also found that Gower's cause of death was the combined
effect and "deliberate overuse" of these drugs. (<u>Id.</u>).

8

After Mrs. Gower exhausted her administrative remedies, she filed the present lawsuit in the Circuit Court of Marion County, West Virginia, on September 14, 2006. Asserting ERISA preemption, AIG removed the lawsuit to this Court on October 16, 2006, after which the parties filed the present cross-motions for summary judgment.

### III. Relevant Policy Provisions

In its Policy's introductory paragraph, AIG expressly "agrees to insure eligible persons of the Policyholder . . . against loss covered by this Policy subject to its provisions, limitations, and exclusions." (AIG/Gower 537). In its Benefits section, the Policy sets forth in greater detail the "Accidental Death Benefit," stating that, "[i]f Injury to the Insured Person results in death within 365 days of the date of the accident that caused the Injury, the Company will pay 100% of the Principal Sum."[2] (Id. at 541). In its Exclusion section, however, the Policy expressly excludes "any loss caused in whole or in part by, or resulting in whole or in part from . . . suicide or any attempt at suicide, while sane, or intentionally self-inflicted injury or any attempt at intentionally self-inflicted injury" from coverage. (Id. at 543).

---

[2] The parties do not to dispute that the accidental death benefit under the Policy is $70,000, and that Mrs. Gower is the sole beneficiary under the Policy. (AIG/Gower at 363-64).

<u>MEMORANDUM OPINION AND ORDER</u>

In its Definitions section, the Policy defines "Injury" as "bodily injury caused by an accident occurring while this Policy is in force as to the person whose injury is the basis of a claim and resulting directly and independently of all other causes in a covered loss." (AIG/Gower 539). Significant to the present matter, the Policy, however, does not define "accident."

Under the Claims provisions of the Policy, the claimant must submit written notice to the company within twenty days in the event of an Insured's loss. (AIG/Gower 544). After receipt of the written notice, the company will send claim forms to the claimant. (<u>Id.</u>). In its "Proof of Loss" subsection, the Policy states:

> Written proof of loss must be furnished to the Company within 90 days after the date of the loss. . . . Failure to furnish proof within the time required neither invalidates nor reduces any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity of the claimant, later than one year from the time proof is otherwise required.

(<u>Id.</u>). In its "Payment of Claims" subsection, the Policy further states:

> Upon receipt of due written proof of death, payment for loss of life of an Insured Person will be made to the Insured Person's beneficiary as described in the Beneficiary Designation and Change provision of the General Provisions . . . .

MEMORANDUM OPINION AND ORDER

(<u>Id</u>.).  With respect to the timing for payment of claims, the Policy states that "[b]enefits payable under the Policy for any loss other than loss for which this Policy provides any periodic payment will be paid immediately upon the Company's receipt of due written proof of loss." (<u>Id.</u>).

If a claim for benefits is denied, pursuant to the terms and conditions of ERISA the claimant has the right to a review through an appeal. (AIG/Gower 89).  The claimant must submit her appeal in writing to the Claims Department no later than sixty days after receiving notice of the denial of payment. (<u>Id.</u>).  After exhausting all administrative remedies, pursuant to ERISA, 29 U.S.C. § 1132(a), the claimant then has the right to bring a civil action such as the one here.

## IV. ERISA Standard of Review

In reviewing an ERISA plan administrator's decision to deny benefits, a district court must initially decide whether the plan's language grants the administrator discretion to determine the claimant's eligibility for benefits. 29 U.S.C. § 1132(a)(1)(B); <u>see</u> <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989); and <u>Quesinberry v. Life Ins. Co.</u>, 987 F.2d 1017, 1021 (4th Cir. 1993). If the reviewing court determines that the language of the plan does not expressly confer discretionary authority on the

administrator, the Court will review the denial of benefits under

a <u>de novo</u> standard of review.  <u>Bruch</u>, 489 U.S. at 109.  If, however,

the plan confers discretion on the administrator to determine

eligibility or to construe terms of the plan, a court reviews a

decision to deny benefits for abuse of discretion.  <u>Bruch</u>, 489 U.S.

at 115; <u>Quesinberry</u>, 987 F.2d at 1021.

> There are obviously no magic words required to
> trigger the application of one or another
> standard of judicial review.  In this setting,
> it instead need only appear on the face of the
> plan documents that the fiduciary has been
> "given [the] power to construe disputed or
> doubtful terms" -- or to resolve disputes over
> benefits eligibility -- in which case "the
> trustee's interpretation will not be disturbed
> if reasonable."

<u>De Nobel v. Vitro Corp.</u>, 885 F.2d 1180, 1187 (4th Cir. 1989)

(citing <u>Bruch</u>, 489 U.S. at 115).

It is well-settled that the grant of discretionary authority

may be by implication; however, the intention to grant such

authority must be clear.  <u>Gallagher v. Reliance Standard Life Ins.</u>

<u>Co.</u>, 305 F.3d 264, 268 (4th Cir. 2002); <u>Feder v. Paul Revere Life</u>

<u>Ins. Co.</u>, 228 F.3d 518, 523 (4th Cir. 2000).  Accordingly, any

ambiguity in an ERISA plan is construed against the drafter of the

plan and in accordance with the reasonable expectations of the

insured.  <u>Id.</u>

Here, the parties disagree about whether the particular Policy language, "due written proof of death," clearly vests discretion in the administrator.  The pertinent sections of the Policy are as follows:

> **Proof of Loss**. <u>Written proof of loss</u> must be furnished to the Company within 90 days after the date of the loss. . . .

> **Payment of Claims**. Upon receipt of <u>due written proof of death</u>, payment for loss of life of an Insured Person will be made to the Insured's beneficiary as described in the Beneficiary and Designation and Change provision of the General Provisions section. . . .

> **Time of Payment of Claims**. Benefits payable under this Policy for any loss other than loss for which the Policy provides any periodic payment will be made immediately upon the Company's receipt of <u>due written proof of loss</u>.

(AIG/Gower 544) (emphasis added).

In 2000, a district court in the Western District of Virginia interpreted the precise language at issue in this case and held that the phrase "due written proof" does not confer discretionary authority on the administrator. <u>Balthis v. AIG Life Ins. Co.</u>, 102 F.Supp.2d 668, 671 (W.D. Va. 2000).  In <u>Balthis</u>, the district court analyzed the policy language in light of its contextual placement and found it to be a procedural rather than substantive requirement. <u>Id.</u> at 670 (noting that the phrase "due written proof"

13

appeared only in the policy's sections explaining "when claims will be paid and not in the section that delineates how a claim is to be submitted."). The court explained that the dictionary definition of "due" – "according to accepted <u>procedures</u> or required in the <u>prescribed course of events</u>" – supports a finding that its plain meaning is categorical and procedural rather than conditional. <u>Id.</u> (emphasis added) (citing <u>Webster's Collegiate Dictionary</u> 357 (10th ed. 1996)).

In <u>Balthis</u>, the court acknowledged that the "due written proof" language was somewhat ambiguous and stressed that, "[i]f the parties had wished to confer discretion on the insurance company, the group policy could easily have included explicit language to that end." 102 F.Supp.2d at 670. Because it concluded that the "due proof" language referred to a procedural rather than an evaluative requirement, the district court concluded that it would apply a <u>de</u> <u>novo</u> standard of review. <u>Id.</u> at 671. Mrs. Gower obviously relies heavily on <u>Balthis</u> to lend support to her argument that the Court should apply a <u>de</u> <u>novo</u> standard of review in this case.

Two years after <u>Balthis</u> was decided, in <u>Thompson v. Life Ins. Co. of N. Am.</u>, 2002 WL 337055, at *3 (4th Cir. 2002) (unpublished), the Fourth Circuit addressed similar "due proof" language and

applied an abuse of discretion standard of review.  Unfortunately, there is little analysis in <u>Thompson</u> explaining how the court reached its decision.  It appears to rely primarily on a Sixth Circuit case that applied an abuse of discretion standard of review to the phrase "satisfactory proof." <u>Id.</u> (citing <u>Perez v. Aetna Life Ins. Co.</u>, 150 F.3d 550, 556 (6th Cir. 1998) (<u>en</u> <u>banc</u>) (finding that "satisfactory evidence" conferred discretion on the policy administrator).  Not surprisingly, the defendants submit that <u>Thompson</u> provides persuasive authority for their contention that the Court ought to apply an abuse of discretion standard of review here.

Just six months after deciding <u>Thompson</u>, however, the Fourth Circuit considered the phrase "satisfactory proof of Total Disability to us" in a published opinion, and held that the language did not grant discretionary authority. <u>Gallagher v. Reliance Standard Life Ins. Co.</u>, 305 F.3d 264, 269 (4th Cir. 2002). In a detailed and thorough analysis, our circuit court stated that "[t]here are two possible ways to interpret [satisfactory proof]:" (1) The claimant must submit satisfactory proof of disability; or (2) the claimant must submit proof of disability that is satisfactory to the administrator. <u>Id.</u>  The court noted that the former interpretation is an objective standard, while the latter is

15

subjective.  Thus, "proof of a total disability that is objectively

satisfactory" would be subject to de novo review, and "proof of a

total disability that [the administrator] finds subjectively

satisfactory" would be reviewed under an abuse of discretion

standard.  Id.

Gallagher held that the phrase "satisfactory proof" is

ambiguous[3] and that the policy failed to vest discretionary

authority in the administrator.  Id. at 270-71.  Accordingly, it

applied a de novo standard of review to the defendant's decision to

deny benefits in that case.  Id.

Although Gallagher did not address the "due proof" language

previously considered in Thompson that is at issue in this case, it

did provide guidance for courts concerning whether policy language

clearly vests discretion in the administrator.  Indeed, several

district courts in this circuit have relied on Gallagher's detailed

analysis when determining whether various policy provisions grant

discretion to the administrator.  See, e.g., Termini v. Life Ins.

Co. of N. Am., 2007 WL 1556850, at *4 (E.D. Va. 2007)(slip copy)

(finding that de novo review applies because the policy's "proper

---

[3] In Gallagher, the court cited a Seventh Circuit Court of Appeals decision
that held that, "[b]ecause it is not clear from the plain language which
interpretation is the correct one, . . . [the policy] failed to reserve
discretionary authority." 305 F.3d at 269 (citing Perugini-Christen v. Homestead
Mortgage Co., 287 F.3d 624, 626 (7th Cir. 2002)).

written proof of such loss" provision resembles the provision in
Gallagher and does not grant the administrator discretionary
authority to determine eligibility benefits) (citation omitted);
Heim v. Prudential Ins. Co. of Am., 2006 WL 382147, at *9 (E.D. Va.
2006) (unpublished) (finding that abuse of discretion review
applies because, unlike the provision at issue in Gallagher, the
policy provision "when Prudential determines that all of these
conditions are met" explicitly sets forth the administrator's
discretionary authority and is subjective).  Of specific relevance
to the instant case is Hughes v. Prudential Life Ins. Co. of Am.,
2005 WL 839924, at *4-5 (W.D. Va. 2005) (unpublished), where a
district court, relying on Gallagher, held that the phrase "due
proof" is susceptible to two interpretations and applied a de novo
standard of review to benefits eligibility decisions made pursuant
to that language.[4]

According to Gallagher, the critical question presented in a
case such as this one is whether the policy language delegates to
the administrator the final authority to determine what proof
submitted in support of a claim is sufficient to award benefits.
Gallagher, 305 F.3d at 270 n.6.  Specifically, in footnote six,

_____

[4] Notably, the district court in Hughes neither relied on nor cited to
Thompson, even though that decision had specifically addressed the "due proof"
language.

Gallagher states that plan language must "'indicate a clear intention to delegate final authority to determine eligibility'" to confer discretionary powers. Id. at 270, n.6 (citing Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 523 (4th Cir. 2000)). It further states that "[f]inal authority to make eligibility determinations is not delegated by 'the mere fact that a plan requires a determination of eligibility or entitlement by the administrator, or requires proof or satisfactory proof of the applicant's claim, or requires both a determination and proof (or satisfactory proof).'" Id. at 270, n.6 (citing Herzberger v. Standard Ins. Co., 205 F.3d 327, 332 (7th Cir. 2000)).

The defendants, nevertheless, would have this Court assume that, under the "due proof" language in AIG's Policy, the administrator's initial decision-making authority necessarily involves an exercise of discretion. They argue that the dictionary definition of the phrase "due proof" establishes that the Policy's language grants discretion to the administrator.

Pursuant to Black's Law Dictionary, the term "due proof" means "sufficient and properly submitted evidence to produce a result or support a conclusion, such as entitlement to benefits supported by an insurance policy." Black's Law Dictionary 517 (7th ed. 1999) (emphasis added). According to AIG, because its policy definition

18

requires that the proof not only be properly submitted but also sufficient, "due proof" contains both a subjective and objective element and triggers an abuse of discretion standard of review.

Even under the definition urged by the defendants, however, the phrase "due written proof" is still open to two possible interpretations.  One would require Mrs. Gower to submit written proof of death that is objectively sufficient. A second would require her to submit written proof of death that the third party administrator determines to be sufficient.  It is therefore impossible to determine from the plain language of the Policy which interpretation is correct; thus, the conclusion follows that AIG's Policy language is ambiguous.

As with the language "satisfactory proof" at issue in Gallagher, the phrase "due written proof" in AIG's Policy here does not clearly establish the intent to grant final discretionary authority to the administrator.  The Court, therefore, will apply a de novo standard of review to the defendants' decision to deny Mrs. Gower benefits in this case.

### V. Analysis of Policy Provisions

AIG's denial of benefits relies on two provisions in its Policy.  First, AIG argues that Gower's death did not result from an injury caused by an "accident."  But even if Gower's death was

an accident, AIG contends that the loss is still excluded from coverage because an "intentionally self-inflicted injury" led to Gower's death. The Court, thus, must evaluate whether AIG's denial of benefits was appropriate under either Policy provision.

## A. "Accidental Death Benefits"

Under the subsection entitled "Accidental Death Benefit," AIG's Policy provides full payment of benefits if an "injury" results in death within one year of the "accident" that caused the injury.[5] The Policy also defines "Injury" as "bodily injury caused by an accident." When interpreting the benefits provisions of an ERISA-regulated insurance policy, courts are guided by federal substantive law, Pilot Life Ins. v. Dedeaux, 481 U.S. 41, 56-57 (1987), and the policy's plain language is "paramount" in the courts' interpretation. Eckelberry v. Reliastar Life Ins. Co., 469 F.3d 340, 343 (4th Cir. 2006). AIG's policy, unfortunately, provides no definition of "accident."

### 1. "Accident" Means "Unexpected"

In examining undefined or ambiguous terms in insurance policies, federal courts have interpreted the provisions in "an ordinary and popular sense," and in a way that "a person of average

---

[5] Under federal common law, the claimant has the burden of proving that death was the result of an accident. Clark v. Metro. Life Ins. Co., 369 F.Supp.2d 770, 775 (E.D.Va. 2005).

intelligence and experience" would interpret them.  <u>Santaella v.
Metro. Life Ins. Co.</u>, 123 F.3d 456, 462 (7th Cir. 1997). Following

that directive, some courts have found that the term "accidental"

is commonly defined as "unexpected <u>or</u> unintentional." <u>Santaella</u>,

123 F.3d at 462 (emphasis added) (citing <u>Casey v. Uddeholm Corp.</u>,

32 F.3d 1094, 1097 (7th Cir. 1994)).  The Fourth Circuit, however,

has acknowledged a distinction between consequences that are

"intended" and those that are "highly likely." <u>Eckelberry</u>, 469 F.3d

at 346.  Analogizing to Russian Roulette, it reasoned in <u>Eckelberry</u>

that "while an insured may not intend to die when he places a

single cartridge into a pistol, spins the cylinder, places the gun

to his forehead, and pulls the trigger, such a result is not just

an unfortunate accident." <u>Id.</u>  In another analogy, it stated that

> . . . out of a desire to avoid being shot,
> burglars typically choose empty homes to rob.
> But if an armed occupant is indeed home, we
> would not regard the burglars being shot as
> "an accident" in the same way we would treat a
> misfire at a shooting range. . . . [I]ntention
> does not alone render a result "accidental." .
> . . [U]njustifiable optimism about one's odds
> (or failure to even calculate them) does not
> relieve conduct . . . of foreseeable results.

<u>Id.</u>  Simply put, then, an act may be unintentional but not an

accident.

Additionally, in <u>Poeppel v. Hartford Life Ins. Co.</u>, 273

F.Supp.2d 714, 718 (D. SC. 2003), a district court in South

21

Carolina referenced <u>Black's Law Dictionary's</u> definition of "accident" and noted that an "accident" is ". . . an event which, under circumstances, is unusual and not expected by the person to whom it happens." Thus, the common meaning of "accident" is an "unexpected" event.

**2. Determining Whether Death Was "Unexpected"**

The Fourth Circuit recognized that the term "unexpected" is ambiguous in <u>Eckelberry</u>, where it was reviewing a denial of benefits under a life insurance policy that specifically defined accident as "an unexpected and sudden event which the insured does not foresee . . . ." 469 F.3d at 343. Because the term was ambiguous, the Fourth Circuit adopted the subjective/objective analysis initially articulated by the First Circuit in <u>Wickman v. Nw. Nt'l Ins. Co.</u>, 908 F.2d 1077, 1087-88 (1st Cir. 1990), to determine whether a death constitutes an accident when an insurance policy defines accident as an "unexpected event."[6]

Under <u>Wickman's</u> subjective/objective framework adopted in <u>Eckelberry</u>, a court must determine, first, whether the deceased had a subjective expectation of survival. If so, it must next determine whether the deceased's underlying suppositions for that

---

[6] In <u>Wickman</u>, the First Circuit Court of Appeals reviewed a denial of benefits under a policy that defined "accident" as "an unexpected, external, violent and sudden event." <u>Id.</u> at 1081.

expectation were reasonable. If there is insufficient evidence to determine the deceased's subjective expectations, a court must analyze whether an expectation of survival was objectively reasonable. 469 F.3d at 343; see also Wickman, 908 F.2d at 1088. An "objective" analysis asks "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the [death] as highly likely to occur as a result of the insured's intentional conduct." Eckelberry, 469 F.3d at 343.

Because an "accident" is an "unexpected event," application of the analysis approved in Eckelberry is appropriate here to determine whether AIG properly denied benefits under the "Accidental Death Benefits" provision of its Policy.

### 3. Gower's Death Was An Accident

The parties do not dispute that Gower's death resulted from the combined effect of fentanyl, olanzapine, carisoprodol and diazepam. (AIG/Gower 373). AIG, however, argues that the record provides insufficient evidence to determine Gower's subjective expectation, and further, even if the record did contain sufficient information to establish that Gower subjectively expected to survive, that such expectation was objectively unreasonable. AIG asserts that a reasonable person would have known that ingesting a toxic level of fentanyl in combination with a toxic level of

olanzapine - an unprescribed drug for Gower, was highly likely to result in a fatal overdose.

To the extent that the administrative record contains no direct evidence of Gower's expectation at the time he took the medications, AIG's characterization of the evidence is correct. For example, had Gower left a suicide note, or had he made statements to his wife that he planned to increase his medication and take her medication for therapeutic purposes, there would be direct evidence of Gower's subjective expectation.

The lack of such direct evidence, however, does not necessarily foreclose a determination of what Gower expected, for, when the administrative record in this case is considered in its entirety, there is sufficient evidence from which to conclude that Gower had a subjective expectation of survival and that his expectation was reasonable. According to the administrative record, Gower was a forty-one year-old male who worked as a coal miner. (AIG/Gower 41). For over four years, he had been prescribed the Duragesic patch for gradual release of medicine for pain management purposes. (<u>Id.</u> at 48). At the time of his death, his prescription instructed Gower to apply one to two patches every three days. (<u>Id.</u> at 48). But as Mrs. Gower's expert pharmacist noted in his report, patients often develop a tolerance to the

therapeutic effects of fentanyl and require larger doses. (<u>Id.</u> at 45).

For Gower, pain management required significantly more than periodic application of Duragesic patches.  He also took a combination of prescription pills, including but not limited to 350mg of carisoprodol (muscle relaxant) three times daily (<u>id.</u> at 42), 10mg of diazepam (Valium) two times daily (<u>id.</u> at 43), and 10mg of hydrocodone (Lortab, Vicoprofen) four times daily, as well as over-the-counter pain agents such as aspirin. (<u>Id.</u> at 43-44).

Notably, Gower had taken this large quantity of medicines for four years without ill effect. (<u>Id.</u> at 48).  Thus, it is highly likely that he had developed an increased tolerance to a variety of medications.  Accordingly, even if one assumes that Gower intended to double his dosage of fentanyl and ingest his wife's olanzapine, there is no evidence that he had the knowledge or experience to expect that the combined effect of these drugs would cause his death.

The administrative record also establishes that Gower administered his medications with a certain degree of precision in the time period immediately preceding his death.  At the time of his death, he was wearing four Duragesic patches – two on each arm. (AIG/Gower 394).  Additionally, Gower ingested no more than eight

of his wife's Zyprexa, despite the fact that eighty-two pills of that prescription remained available to him. (<u>Id.</u> at 44). Nor did he use the sixteen Duragesic patches remaining from his four-day old refill (<u>id.</u> at 114), or ingest the remainder of his hydrocodone and carisoprodol prescriptions. (<u>Id.</u> at 394).

Considering the amount of medicine Gower was used to taking, and the large amount of pills and patches available to him before he died, this Court cannot conclude that Gower ingested an extraordinarily large dose of dangerous drugs with the expectation that he would die. On the contrary, his discretionary use supports a conclusion that, subjectively, he expected to relieve his pain and survive.

Mrs. Gower's affidavit, moreover, establishes that her husband was not under any new or unusual stressors. (AIG/Gower 37). Nor was he experiencing marital, financial or employment problems, and he had no history of depression or suicidal tendencies. (<u>Id.</u>). In fact, on the evening preceding his death the only notable problem in Gower's life was a headache. (<u>Id.</u>). Thus, there is no evidence that he previously had overused his medications, (<u>id.</u> at 114), had experienced a serious change in circumstances, or had expressed any suicidal ideation.

The totality of the evidence in the record weighs in favor of the conclusion that Gower did not expect his actions to result in death. He had insufficient knowledge and experience of drug interactions to realize the devastating results of the combined dosages, and he took only a small portion of the medications available to him. Gower, therefore, had a subjective expectation of survival that was reasonable, and the Court concludes that his death constitutes an accident within the meaning of the Policy's provisions.[7]

## B. Exclusion For "Intentionally Self-Inflicted Injury"

AIG also relies on the Policy's "intentionally self-inflicted injury" exclusion to support its denial of benefits.[8] The Policy, in relevant part, states that it does not cover any loss "caused in whole or in part by . . . intentionally self-inflicted injury or any attempt at intentionally self-inflicted injury." The Policy, however, does not define the term "intentional."

---

[7] Because the evidence in the record is sufficient to determine Gower's subjective intent, the Court need not reach the objective prong of the Eckelberry test.

[8] When an insurer denies benefits based on a policy exclusion, the burden is on the insurer to prove facts showing that the exclusion applies. Critchlow v. First UNUM Life Ins. Co. of Am., 378 F.3d 246, 257 (2d Cir. 2004).

MEMORANDUM OPINION AND ORDER

### 1. "Intentional" Means "Purposeful"

The term "intentional" should be construed as it is understood in the "ordinary and popular sense," and in the way that a "person of average intelligence and experience" would interpret it. Padfield v. AIG Life Ins. Co., 290 F.3d 1121, 1129 (9th Cir. 2002); Santaella v. Metro. Life Ins. Co., 123 F.3d 456, 463 (7th Cir. 1997). "Intentional" means "done with the aim of carrying out the act." Black's Law Dictionary (8th ed. 2004). The "intention" to do something is "[t]he willingness to bring about something planned or foreseen." Id. Furthermore, "the common understanding of the definition of 'intention' requires that the action be purposeful towards a goal." Andrus v. AIG Life Ins. Co., 368 F.Supp.2d 829, 834 (N.D. Ohio 2005) (citing Sperle v. Mich. Dep't of Corr., 297 F.3d 483, 496 (6th Cir. 2002)); see also Santaella, 123 F.3d at 465 (finding that an insurance policy did not exclude coverage under an "intentionally self-inflicted injury" exclusion because the evidence did not show a "purposeful infliction of injury") (emphasis added).

In Santaella, the Seventh Circuit Court of Appeals concluded that MetLife's "intentionally inflicted injury" exclusion did not preclude coverage where the decedent overdosed on her prescription pain medication. Id. at 459. In evaluating whether MetLife could

28

rely on the policy's "intentionally inflicted injury" exclusion, the court stated that, "although Eldridge voluntarily took propoxyphene in a dangerous overdose amount," nothing in the record indicated that she purposefully inflicted injury on herself. Id. at 465. The court reasoned that "[a] self-inflicted injury may be accidental, where accidental is taken to mean unintentional rather than unexpected." Id. As an example, the court stated that "it is an accident when someone hits his thumb with a hammer when driving a nail. The injury was self-inflicted but not intended, hence accidental." Id. at 465 (quoting Casey, 32 F.3d at 1097). Therefore, despite the fact that Eldridge's injury was self-inflicted, the court determined that "[t]he record simply will not support a determination by the trier of fact that [she] did anything other than make a fatal mistake." Id.

In Andrus v. AIG Life Ins. Co., 368 F.Supp.2d at 831, a district court in the Northern District of Ohio reviewed AIG's denial of benefits under exclusionary language identical to the Policy language at issue in this case. In evaluating whether Andrus's death had been caused by an "intentionally self-inflicted injury," the court reasoned that "[t]he issue with regard to Andrus's intent is not whether Andrus intentionally took the drugs or that he knew injury could occur, but rather if he took the drugs

MEMORANDUM OPINION AND ORDER

intending to kill or injure himself." Id. at 834. Applying that

test, the court concluded that the "intentionally self-inflicted

injury" exclusion in AIG's Policy did not preclude coverage when

the decedent overdosed on his prescription medication. Id.

AIG, however, relies on a contrary holding in Holsinger v. New

Eng. Mut. Life Ins., 765 F.Supp. 1279, 1282 (E.D. Mich. 1991), to

support its argument that its Policy excludes coverage for Gower's

death because it was caused by an "intentionally self-inflicted

injury." In Holsinger, a district court in the Eastern District of

Michigan answered four questions to determine whether the

"intentionally self-inflicted injury" exclusion applies in cases

involving a drug overdose or intoxication. Id. These questions

included: (1) whether the ingestion of drugs was intentional; (2)

whether the decedent knew that the ingestion of drugs would be

likely to cause an injury; (3) whether the ingestion of the drugs

caused an injury; and (4) whether the loss resulted from the

injury. Id.

Significantly, the court concluded:

> It is important to note that the injury caused
> by an ingestion of prescription drugs taken
> for a purpose other than the therapeutic
> effect for which they are designed need not be
> the injury that results in the loss. For
> example, when the loss is death, it is not
> necessary that the person ingesting the drugs
> know that death could result. If the person

> ingesting the drugs has a general cognizance
> that the drugs could produce some injury, it
> is enough that there is some causal relation
> between the injury caused and the ultimate
> loss.

Id.

Given the commonly-accepted understanding that "intentional" means "purposeful," this Court rejects the test in Holsinger. A person's "general cognizance" that an injury could result from his actions does not lead to the conclusion that he intended to inflict an injury. In Andrus, 368 F.Supp.2d at 834, for example, the court stressed that "[o]ne cannot work backward from the outcome to the mental state: all that is certain is that Andrus's death resulted from a drug overdose. The overdose alone is not preponderant proof of the death." Indeed, Andrus further noted that injuries are often the foreseeable consequence of risky actions.

> For example, it is foreseeable that one will
> get into an automobile accident while
> operating a car; however, that does not mean
> that whenever one operates a car he intends to
> get into an accident. To say otherwise would
> eviscerate the insurance policy.

Id. Thus, although Andrus voluntarily ingested his prescription drugs, the court concluded that nothing in the record demonstrated that he "purposefully" acted to injure himself. Id.

AIG argues that a person need only have a general cognizance that an injury might result from his actions to trigger the

Policy's exclusion. This Court, however, cannot conceive of a scenario in which a person who acts intentionally does not face unexpected and potentially injurious consequences. Because AIG's rationale defeats the purpose of life insurance coverage, the Court rejects it. Accordingly, in assessing whether the exclusion applies here, the relevant inquiry is whether Gower ingested a lethal dose of medications to purposefully injure himself.

### 2. AIG's "Intentionally Self-Inflicted Injury" Exclusion Does Not Apply

Nothing in the administrative record supports AIG's characterization of Gower's drug intoxication as an intentionally self-inflicted injury. The parties do not dispute that Gower voluntarily took the medications that led to an injury, and that the combined effect of the medication led to probable respiratory arrest. The mere act of voluntarily taking medications, however, does not meet the "intentional" threshold, absent other evidence that Gower purposefully acted to injure himself. See Andrus, 368 F.Supp.2d at 834. As noted earlier in this opinion, there is no evidence that Gower had any expectation of death. Nor is there sufficient evidence to support the conclusion that Gower took his medications to purposefully injure himself. What the totality of the evidence in the record does suggest is that Gower voluntarily took medications intending to temporarily relieve his pain and

overall poor health, not to inflict any type of injury, much less to cause his own death.  That an overdose occurred and resulted in death does not, of itself, provide the critical and necessary link to the requisite mental state.  Accordingly, this Court holds that AIG's Policy exclusion for loss caused in whole or in part by an intentionally self-inflicted injury does not apply in this case.

## VI. Conclusion

Based on the information provided in the administrative record, the Court concludes that AIG improperly denied Mrs. Gower's claim for benefits under the Policy.  It, therefore, (1) **GRANTS** plaintiff's motion for summary judgment, (2) **DENIES** defendants' motion for summary judgment and (3) **DIRECTS** the Clerk to enter judgment in favor of the plaintiff.

It is **SO ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record.

DATED: July 20, 2007

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE